**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ARJO, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18 C 2554** |
| | ) | |
| **HANDICARE USA, INC., HANDICARE** | ) | |
| **DENVER, ARJO-CENTURE DISTRIBUTING,** | ) | |
| **INC., and KARMAN D. CUSACK,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

 Arjo Inc. has sued Handicare USA, Inc., Handicare Denver, Arjo-Century

Distributing, Inc. (ACD), and Karman Cusack in a four-count complaint alleging (1)

violations of the Illinois Trade Secrets Act (ITSA), 765 ILCS 1065/3, (2) breach of

fiduciary duty, (3) breach of contract, and (4) tortious interference.  On April 10, Arjo

moved for a temporary restraining order against the defendants alleging ongoing

misappropriation of trade secrets and other injuries.  The Court denied the TRO in an

oral ruling on May 2 concluding that Arjo had not made a sufficient showing that it likely

would succeed on its claims.[1]  The Court approved an expedited discovery schedule in

anticipation of a motion for preliminary injunction.  Arjo filed a motion for preliminary

---

[1] On the same day, the Court granted Handicare USA's motion to dismiss the claims
against it for lack of personal jurisdiction.

injunction on August 31.

For the reasons stated below, the Court denies Arjo's motion for a preliminary injunction.

## Background

"When a motion for preliminary injunction is presented to a court in advance of hearing on the merits, [the Court] is called upon to exercise its discretion 'upon the basis of a series of estimates.'" *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1435 (7th Cir. 1986) (quoting *Perry v. Perry*, 190 F.2d 601, 602 (D.C. Cir. 1951)). Because the record is not yet completely developed, findings of fact made at this stage are inherently preliminary and do not conclusively resolve matters disputed by the parties. *See Lektro-Vent Corp. v. Vendo Co.*, 660 F.2d 255, 264 (7th Cir. 1981).

Arjo is a global medical device supplier. It sells devices like bed lifts to clients such as hospitals and nursing homes. For about twenty-six years, until January 2018, Arjo-Century Distributing, Inc. (ACD) was Arjo's exclusive distributor in nine western states and a non-exclusive distributor in two others. Karman Cusack served as ACD's president. Cusack reports that in recent years Arjo typically made $3-to-5 million in annual revenue from medical device sales in ACD's territory. Arjo's Vice President of Marketing, Christopher Ryan, reports that the company earns $750-to-800 million annually across all of its operations.

Since 2001, ACD operated under a distributor agreement with Arjo. Among other things, Arjo contends that the agreement established that ACD would act merely as an intermediary between Arjo and its customers rather than as an independent buyer and seller of Arjo's products. Arjo also contends that the confidentiality provisions of the

2

distributor agreement precluded ACD's agents, including Cusack, from communicating any of Arjo's confidential information to third parties without Arjo's express consent. The confidentiality term included no geographical or timing limitations. Finally, Arjo contends that the agreement forbade the defendants from working with or representing any of Arjo's competitors while the agreement was in effect.

In January 2018, Cusack sold ACD's assets to Handicare, one of Arjo's competitors, and simultaneously terminated the distributor agreement. Cusack almost immediately began working for an entity called Handicare Denver. Arjo contends that, as part of the deal with Handicare, Cusack transferred Arjo's trade secrets in violation of the confidentiality agreement and state law. It also alleges that Cusack's immediate move to Handicare Denver violated the representation provision of the distributor agreement. By its own terms, Arjo contends, the contract required three months' written notice for termination and therefore remained in effect for ninety days after Cusack gave notice. Arjo further alleges that Cusack took various actions to undermine Arjo in the time preceding his move to Handicare and in the ninety days following the agreement's termination. For his part, Cusack contends that the confidentially provision is unenforceable, the sale was lawful, and his split from Arjo was precipitated by Arjo's own mismanagement of accounting services that caused credit freezes and diminished profitability before ultimately forcing ACD to turn to another manufacturer.

The information Arjo accuses the defendants of misappropriating falls into roughly four categories: (1) pricing and sales contract information, including distributor pricing; (2) customer lists and related identifying information; (3) information related to Arjo's diligent assessment program (alternatively referred to as the patient handling or

transfer program); and (4) slides related to a strategic analysis of Arjo's products, its marketing strategy, and related information about the company's business strategy.

## Discussion

Arjo has moved for a preliminary injunction against ACD and Cusack. "A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015); *see also Winters v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In this circuit, "a district court engages in a two-step analysis to decide whether such relief is warranted." *Turnell*, 796 F.3d at 661.

> In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits.
> If the movant makes the required threshold showing, then the court proceeds to the second phase, in which it considers: (4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (the "public interest"). . . . The court weighs the balance of potential harms on a "sliding scale" against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor.

*Id.* at 661-62 (internal citations omitted). "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895-96 (7th Cir. 2001).

As an initial matter, the defendants incorrectly contend that the plaintiff's motion

should fail because it is based on inadmissible evidence.  That contention is contrary to governing precedent.  *See Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997) ("Affidavits are ordinarily inadmissible at trials but they are fully admissible in summary proceedings, including preliminary-injunction proceedings."); *SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991) ("[H]earsay can be considered in entering a preliminary injunction.").

The Court assesses the preliminary injunction factors in the order they were argued by the parties in their briefs.

**A.      Likelihood of success on the merits**

The showing required to demonstrate likelihood of success on the merits at this stage is relatively forgiving.  The plaintiff must demonstrate simply that its chance of success on the merits is "better than negligible."  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).  Arjo brought this preliminary injunction motion on the basis of three of its four claims:  those alleging violations of the Illinois Trade Secrets Act, breach of contract, and tortious interference.

**1.      Illinois Trade Secrets Act**

Arjo's first claim alleges violations of the Illinois Trade Secrets Act.  The Act empowers courts to issue injunctions where a plaintiff can demonstrate (1) the existence of a trade secret; (2) the misappropriation of that trade secret; and (3) actual or potential damages resulting from that misappropriation.  *See Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016); *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 280-81, 827 N.E.2d 909, 924 (2005).  The ITSA also protects against threatened misappropriations, which have been addressed under the

"inevitable disclosure" doctrine. Under that doctrine, "a plaintiff may prove trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995).

### a. Existence of trade secrets

Arjo alleges misappropriation of four categories of information. To demonstrate the allegedly misappropriated materials were trade secrets within the meaning of the ITSA, Arjo must show that they were "(1) sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) [was] the subject of efforts that [were] reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). In addition to these statutory factors, Illinois courts weigh six common-law factors. *See Mickey's Linen v. Fischer*, No. 17 C 2154, 2017 WL 3970593, at *9 (N.D. Ill. Sept. 8, 2017). Although those common-law factors are largely duplicative, two are particularly relevant here: (a) the extent to which the information in question is known outside of the plaintiff's business and (b) the ease or difficulty with which the information can be properly acquired or duplicated by others. *Id.* Where an item of information is within the realm of general knowledge in an industry, it cannot be a trade secret. *Pope v. Alberto-Culver Co.*, 296 Ill. App. 3d 512, 515, 694 N.E.2d 615, 617 (1998).

On the first of the statutory factors, Arjo asserts in its brief in general terms that all the categories of disputed information are valuable. It points to Handicare's willingness to pay $3.4 million for ACD's assets (allegedly including Arjo's confidential

information) and Handicare's ability to quickly establish itself in ACD's territory as evidence of that value. At the hearing on the motion, Arjo for the first time offered individualized analysis of why each category of information was valuable. First, it explained that the allegedly misappropriated pricing information included not just customer pricing, but also so-called "distributor pricing"—i.e., the price distributors like ACD pay to manufacturers like Arjo. It explained that distributor price terms, unlike customer pricing, are protected by confidentiality agreements. Second, Arjo again pointed to Handicare's quick launch as evidence of the value of the customer lists. Third, it cited Arjo Vice President for Marketing Christopher Ryan's deposition testimony that Arjo's diligent assessment program is the company's "secret sauce." Defs.' Ex. C, dkt. no. 73-9, at 34:9-18. Publication of the program's details, it argued, would rob Arjo of decades of work toward its perfection. Finally, Arjo broadly argued that slides from strategy presentations contained information that would enable a competitor to unfairly compete.

Under the second statutory factor, Arjo claims that it took "great efforts" to create and maintain secrecy regarding the disputed information. Pl.'s Br., dkt. no. 63-1, at 17. It asserts that the information is password protected and communicated only to individuals who needed to access it pursuant to strict confidentiality requirements.

The defendants argue that Arjo has failed to show a likelihood of success on any of the four categories of allegedly protected items. On customer pricing information, the defendants argue the disputed material was freely shared with customers and available to the public. It cites websites that purport to display Arjo pricing information and a trade catalogue sent to some 16,000 nursing homes that includes the same information.

The defendants further argue that the distributor pricing information, raised by Arjo for the first time at the hearing on this motion, lacks sufficient value to garner trade secret protection. According to the defendants, the profit margin on Arjo-ACD sales contracts was standard in the industry, rendering distributor pricing both easily ascertainable and largely irrelevant to competitive bidding.

The defendants are correct on both customer and distributor pricing information. Pricing information shared freely with customers without confidentiality requirements is insufficiently secret to garner protection. *See UTStarcom, Inc. v. Starent Networks, Corp.*, 675 F. Supp. 2d 854, 866 (N.D. Ill. 2009) ("Absent a showing to the contrary, Illinois courts tend to treat price lists as non-trade secrets, as customers often share that information with one another."). Arjo has produced no evidence that its customers were prevented from freely sharing price information with anyone they pleased. The defendants, on the other hand, have offered evidence that confidentiality agreements were not required of customers.

Nor does the distributor pricing information allegedly misappropriated by the defendants qualify for trade secret protection. To constitute a trade secret under the ITSA, information must be sufficiently secret to derive economic value from not being generally known. 765 ILCS 1065/2(d). The defendants have offered evidence—which Arjo has not even attempted to rebut—that the profit margin enjoyed by Arjo's distributors is standard in the industry. Distributor pricing is therefore easily ascertainable by making a simple calculation using freely available customer pricing information. And even if it were not so easily ascertainable, it is unclear what advantage competitors would garner from the information that they would not derive

8

from customer pricing information alone.  *See Unisource Worldwide, Inc. v. Carrara*, 244 F. Supp. 2d 977, 987 (C.D. Ill. 2003).  Because customer pricing is not confidential and provides a ready means of calculating distributor pricing, distributor pricing information is "not valuable enough to competitors" like Handicare to be a trade secret under the ITSA.  *Id.* (internal quotation marks omitted).

The second category of information that Arjo contends warrants protection as a trade secret involves its customer lists.  As an initial matter, the defendants concede that customer lists can, in some circumstances, be trade secrets.  But they argue that such information is not protectable if, as here, the plaintiff "provides a service commonly utilized by a particular class of potential customers" whose identities are available in public directories.  *Fleetwood Packaging v. Hein*, No. 14 C 9670, 2014 WL 7146439, at *4 (N.D. Ill. Dec. 15, 2014).  The defendants argue that Arjo's customers in the relevant territory—hospitals, nursing homes, and care facilities—are relatively few and are easily ascertainable through the Internet, trade publications, or trade show participation.

The Court agrees with defendants.  Although password protection and other efforts to keep a customer list private are relevant, they are not sufficient to warrant protection if the list can be easily reconstructed using publicly available information.  *Id.* By its own characterization, Arjo's customers in the relevant territory are hospitals, nursing homes, and care facilities.  Available evidence reflects that lists of these entities are available on the Internet or through other publicly accessible materials.  Thus, as in *Fleetwood Packaging*, Arjo's customer lists appear to be easily reverse-engineered using publicly available information.  As a result, the disputed customer lists do not appear likely to warrant protection as trade secrets under the ITSA.

9

That leaves two more categories of purported secrets: information about Arjo's diligent assessment program and the content of slides from presentations on Arjo strategy and products. The defendants argue that information about Arjo's diligent assessment program was insufficiently secret to be protected by the ITSA. If the program's content was ever secret enough to warrant protection, the defendants argue, Arjo destroyed that secrecy by sharing details of the program with customers without imposing any confidentiality requirements. The defendants also argue that programs like this one are commonplace in the industry, rendering the program's content the sort of general knowledge that is unprotectable as a trade secret. *Cf. Pope*, 296 Ill. App. 3d at 515, 694 N.E.2d at 617 (holding information deemed common knowledge unprotectable).

The defendants also dispute Arjo's characterization of the strategy presentations as trade secrets. The presentations, which contain strategic analysis of Arjo's products and assess its marketing strategies, were given at large meetings attended by dozens or even hundreds of people. Arjo has not demonstrated, the defendants contend, that any of the attendees were bound to confidence. Nor, in the case of the product analysis presentation, has Arjo even produced evidence that the author of the presentation was under a confidentiality agreement. Considering Arjo's alleged lack of concern for keeping the presentations secret, the defendants argue, the content of those presentations is unprotectable.

The defendants' arguments on the final two categories of alleged trade secrets are unpersuasive. Although they argue that the diligent assessment program is standard in the industry and that its content is widely shared with customers, Arjo

presented testimony at the hearing on this motion that defendants disclosed confidential details of the program beyond what was shared with the customers. Arjo argued that the program is the secret to its success, and that it has taken decades of effort to develop that secret.

And on the fourth and final category, Arjo's strategy presentations, the defendants' argument is even less plausible. They suggest that Christopher Ryan's inability to recall during his deposition whether every person who ever saw the presentations was sworn to secrecy forecloses their protection. But the standard is whether *reasonable* efforts were undertaken, and the defendants' proposed approach would rob too much highly sensitive information of protection. Arjo's argument that presentations about its business, operational, and marketing strategies were held in confidence appears likely to have merit.

The Court concludes that Arjo has made a sufficient showing of its likelihood of success regarding the protected character of the diligent assessment program information and the slides addressing Arjo strategy and product analysis. Given that both appear to include confidential details of Arjo's business operations and strategic vision, the Court is persuaded that the plaintiff has a nonnegligible likelihood of success in proving the first element of ITSA liability with respect to those two categories. The same is not true of the pricing information and customer lists, discussed above, which appear unprotectable under the ITSA.

### b.    Misappropriation

The second requirement for liability under the ITSA is that the trade secret was misappropriated. *Allied Waste*, 177 F. Supp. 3d at 1112. The statute defines

"misappropriation" to mean "acquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means." 765 ILCS 1065/2(b). "Improper means" include "theft, bribery, misrepresentation, [or] breach or inducement of breach of a confidential relationship." *Id.* 1065/2(a). Arjo argues that the disputed information was misappropriated because it was disclosed in violation of the distribution agreement signed by Cusack on behalf of ACD. The defendants, on the other hand, take issue with the validity of the confidentiality provision, as discussed below.

The Court concludes, in light of its discussion of the breach-of-contract claim below, that Arjo has cleared this low hurdle on the two surviving categories of allegedly misappropriated information. That is, it has demonstrated a nonnegligible likelihood of success in showing misappropriation.

### C.    Harm

The third and final requirement for ITSA liability is that the misappropriation caused or will cause damages to the trade secret's owner. *See Allied Waste*, 177 F. Supp. 3d at 1112. The plaintiff alleges in general terms that the defendants used the misappropriated information to quickly launch Handicare's business in ACD's territory and to steal away customers that had previously worked with Arjo through ACD. Alternatively, Arjo argues that Cusack's involvement with Handicare will result in the inevitable disclosure of Arjo's trade secrets, which is another way to show harm under *PepsiCo*, 54 F.3d at 1267. But Arjo offers no specific analysis of how either the diligent assessment program information or the slides from Arjo strategy presentations have been or will be used to its detriment.

The defendants argue that there is no evidence that they ever actually used the disputed information in a way that harmed Arjo and that this shortcoming is fatal to Arjo's motion. More precisely, the defendants contend that there is no evidence the disputed information enabled them to box Arjo out of ACD's territory. In support of this assertion, the defendants point to Arjo's new and continuing contracts with some of the customers that the defendants allegedly stole. They also dispute the applicability of *PepsiCo* because the information that Cusack allegedly carried with him to Handicare was far less sensitive than the material disputed in that case. As a result, the defendants argue, Arjo has failed to demonstrate how disclosure has or would harm it.

The Court agrees with the defendants that Arjo has made an insufficient showing of harm caused by the disclosure of the two remaining categories of alleged trade secrets. Even assuming *PepsiCo*'s applicability, the plaintiff must demonstrate a significant likelihood of harm to state a claim under the ITSA. *See PepsiCo*, 53 F.3d at 169 (""[T]he mere fact that a person assumed a similar position at a competitor does not, without more, make it inevitable that he will use or disclose . . . trade secret information so as to demonstrate irreparable injury." (internal quotation marks omitted)); *Fleetwood Packaging*, 2014 WL 7146439, at *7 ("In order to trigger the inevitable disclosure doctrine, a plaintiff must show more than the possibility that defendants *could* misuse the plaintiff's trade secrets; it must show that the defendants *will* misuse those secrets."); *Vienna Beef Ltd. v. Red Hot Chi.*, 833 F. Supp. 2d 870, 876 (N.D. Ill. 2011) (denying an injunction where the plaintiff had failed to demonstrate that its alleged trade secret was ever used by the defendant). Arjo has not done so and has therefore failed to demonstrate a sufficient likelihood of success under the third requirement of the

13

ITSA.

To review, Arjo has demonstrated a nonnegligible chance of success on the first two elements of its ITSA claims as they relate to diligent assessment program and the strategy presentations. But Arjo has failed to make a sufficient showing of harm. As such, Arjo's ITSA claim is insufficiently likely to succeed to support a preliminary injunction.

### 2.    Breach of contract

Arjo's second basis for a preliminary injunction is its breach of contract claim. It first alleges that Cusack and ACD violated the distributor agreement's confidentiality provision. The plain language of that provision forbade Cusack or ACD from disclosing any information held in confidence on behalf of Arjo. Thus the key question is whether the provision is valid and enforceable against the defendants. At the hearing on this motion, Arjo for the first time offered a second basis for its claim: a contractual provision that prohibited ACD or its agents from representing any of Arjo's competitors during the life of the agreement. According to Arjo, that provision remained in effect for ninety days after Cusack terminated the agreement, but Cusack nevertheless immediately pivoted to working with Handicare.

Both the confidentiality provision and the provision prohibiting the defendants from representing Arjo's competitors can properly be characterized as restrictive covenants. In general, a restrictive covenant is reasonable if it:

> (1) is no greater than is required for the protection of a legitimate business interest of the [ ]promisee; (2) does not impose undue hardship on the [ ]promisor[;] and (3) is not injurious to the public. Further, the extent of the [promisee's] legitimate business interest may be limited by type of activity, geographical area, and time.

14

*Reliable Fire Equip. Co. v. Arredondo*, 2011 IL 111871 ¶ 17, 965 N.E.2d 393, 396.

Arjo argues that the confidentiality provision is enforceable even though it lacks durational or geographical-scope limitations. It notes that in *Reliable Fire Equipment* the Illinois Supreme Court moved away from a per se rule of unreasonableness for such restrictive covenants. The defendants, on the other hand, argue that the confidentiality provision did not survive the termination of the distribution agreement. Specifically, they note that the contract included a provision expressly identifying which of the contract's terms would survive its termination, and that the confidentiality provisions were not included. Alternatively, the defendants argue that the nondisclosure agreement was unenforceable due to the lack of reasonable time and territory restrictions.

Arjo is correct that the Illinois Supreme Court has moved away from a bright-line rule for assessing the reasonableness—and, in turn, the enforceability—of restrictive covenants. Instead, the validity of the provisions in question here "depend[s] on the specific facts and circumstances of the individual case." *Id.* ¶¶ 43, 47, 965 N.E.2d at 403-04. At the preliminary injunction stage, the specific facts of the case are still being developed by the parties. It is thus typically inappropriate to conclude such a claim is hopeless on a motion for preliminary injunction. *See Traffic Tech. Inc. v. Kreiter*, No. 14-cv-7528, 2015 WL 9259544, at *17 (N.D. Ill. Dec. 18, 2015). Because the resolution of Arjo's breach of contract claim is unclear, the Court concludes that Arjo has demonstrated a sufficient likelihood of success to clear the first hurdle on a request for a preliminary injunction.

### 3. Tortious interference

Arjo's third and final basis for its motion is its tortious interference claim.  To prevail on this claim, Arjo must establish that (1) it had a reasonable expectation of entering into a valid business relationship; (2) the defendants knew of that expectation; (3) the defendants' intentional and unjustifiable interference caused a breach or termination of the expectation, and (4) Arjo suffered damage as a result of the defendants' conduct.  *F:A J Kikson v. Underwriters Labs., Inc.*, 493 F.3d 794, 800 (7th Cir. 2007).

Arjo argues that it has again met its burden, because it had business relationships with the customers it alleges ACD stole from it in the wake of Cusack's transition to Handicare.  And Arjo argues it had a reasonable expectation that these business relationships would continue indefinitely if not for the defendants' misdeeds—a fact that the defendants were allegedly aware of when they chose to interfere.  Arjo also contends it has suffered economic damages as a result of the interference.

The defendants first argue that the tortious interference claim is preempted. They note that the ITSA expressly "displace[s] conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret."  675 ILCS 7065/8(a).  The Seventh Circuit has explained that the effect of this provision is limited—it abolished only causes of action that "rest on the conduct that is said to misappropriate trade secrets."  *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404-05 (7th Cir. 2005).  The ITSA therefore preempts a tortious interference claims like this one if it is wholly dependent on the existence of the allegedly misappropriated information.  *XPO Logistics, Inc. v. Best Dedicated Solutions, LLC*, No. 17 C 1946, 2017

WL 4150779, at *3 (N.D. Ill. Sept. 18, 2017); *see also Traffic Tech*, 2015 WL 9259544, at *15.

   *XPO Logistics* illustrates the ITSA-preemption standard.  There, the plaintiff alleged that the defendant had tortiously interfered "by soliciting, or otherwise conducting business with, XPO's customers" using allegedly secret customer information and "by inducing XPO's former employees to breach their post-employment contractual obligations to XPO, to solicit XPO's customers, and to disclose XPO's confidential information."  *XPO Logistics*, 2015 WL 4150779, at *3.  The court concluded that the claim was preempted to the extent that it was premised on acts of "misappropriation and disclosure."  *Id.*  The claim survived, however, because it sought recovery not just for the acts of disclosure, but also for "for the alleged damage [the defendant] caused by raiding XPO's employees and thereafter using those employees and their knowledge . . . to solicit XPO's customers, thereby interfering with XPO's prospective business opportunities."  *Id.*  In other words, the tortious interference claim could have stood even without the alleged misappropriation.

   Here, Arjo alleges in its complaint a theory of tortious inference flowing from actions beyond the alleged misappropriation of trade secrets.  In its brief and at oral argument, Arjo supplemented its complaint by contending that the defendants took other actions such as (1) breaching the representation provision by entering exclusive service contracts with at least two former Arjo customers, (2) overinflating price quotes to at least one other customer before transitioning to Handicare, (3) withholding installation of new products in the months preceding their departure in an effort to stockpile business for their new venture, and (4) perhaps even telling customers that

Arjo was going out of business.

To the limited extent that it is premised on alleged disclosure of Arjo's trade secrets, the tortious interference claim is preempted by the ITSA. But the alternative allegations discussed here are sufficient to carry Arjo's burden. That is, the actions it alleges the defendants took to interfere with Arjo's business relationships support a nonnegligible likelihood of success on the tortious interference claim. The tortious interference claim therefore satisfies the first element of the preliminary injunction standard.

**B.     Irreparable injury and adequacy of the remedy at law**

Arjo must demonstrate that it will suffer an irreparable injury absent the court's intervention and that its remedy at law is inadequate. Because, as discussed above, Arjo has failed to show a sufficient likelihood of success on the merits of its ITSA count, the Court confines its analysis to the breach-of-contract and tortious-interference claims.

"To say that [an] injury is irreparable means that the methods of repair (remedies at law) are inadequate." *Fleet Wholesale Supply Co., Inc. v. Remington Arms Co., Inc.*, 846 F.2d 1095, 1098 (7th Cir. 1988). Timing bears heavily upon the irreparable harm analysis in two ways. First, a significant delay in filing a motion for preliminary injunction undermines the moving party's argument that it will suffer irreparable harm without an injunction. *See Traffic Tech Inc. v. Kreiter*, No. 14-cv-7528, 2015 WL 9259544, at *17 (N.D. Ill. Dec. 18, 2015); *Stokley-Van Camp, Inc. v. Coca-Cola Co.*, No. 86 C 6159, 1987 WL 6300, at *3 (N.D. Ill. Jan. 30, 1987) ("[T]he fact that [the plaintiff] waited three months indicates a lack of a need for the extraordinary remedy of a preliminary injunction."). Second, the plaintiff must demonstrate that it "*will suffer*"—that is, in the

18

future—"irreparable harm in the interim prior to final resolution." *Turnell*, 795 F.3d at 662 (emphasis added); *see also Winters*, 555 U.S. at 20. If "the damage is done," allegations of past irreparable harm, no matter how plausible, are insufficient to support a preliminary injunction. *Traffic Tech*, 2015 WL 9259544, at *17.

Arjo attempts to avail itself of a rebuttable presumption of irreparable harm where a movant alleges misappropriation of trade secrets under Illinois law. *See Intertek USA Inc. v. AmSpec, LLC*, No. 14 CV 6160, 2014 WL 4477933, at *6 (N.D. Ill. Sept. 11, 2014); *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 700 (N.D. Ill. 2004). But because the ITSA claims failed at the first step, the presumption is inapplicable, and Arjo must carry its full burden.

On its surviving claims, Arjo argues that it faces irreparable harm and that its remedies at law are inadequate. It suggests that each time Cusack did business with customers in ACD's territory on Handicare's behalf, there was an irreparable violation of the distributor agreement—at least for the first ninety days after Cusack's January 2018 split from Arjo—and that the defendants have tortiously interfered with its business. Arjo emphasizes that, without an injunction, the defendants could "continu[e] to steal Arjo's customers," causing it to "lose profits and suffer damages to its goodwill and reputation with long-standing customers." Pl.'s Br., dkt. no. 63-1, at 24. During the hearing on the motion, Arjo emphasized two contracts the defendants inked with customers in the territory in the weeks after the distributor agreement was terminated that were allegedly designed to unfairly box Arjo out. The defendants counter that an injunction is inappropriate for any of these allegedly irreparable harms because they already occurred.

19

Arjo has failed to demonstrate that it faces irreparable injury. Based on available evidence, any such harm has long since occurred—and, the Court notes, it is quantifiable and therefore adequately remedied with money damages. Arjo's allegation that it will continue to suffer a loss of customer good will does not entitle it to an injunction, as the Seventh Circuit has specifically disclaimed a "per se rule" that ongoing "loss of consumer goodwill and relationships" based on past wrongful acts is irreparable. *Lawson Prods.*, 782 F.2d at 1440. Indeed, to the extent the defendants are allegedly still luring business away from Arjo, it offers no reason that money damages in the amount of lost profits would not be an adequate remedy. *See Fleetwood Packaging*, 2014 WL 7146439, at *10 (discussing the adequacy of money damages to remedy injuries caused by a defendant's allegedly ongoing efforts to lure the plaintiff's customers away and the associated loss of good will). Arjo's oblique references to the continuing threat of future loss are insufficient to support a preliminary injunction. *See Traffic Tech*, 2015 WL 9259544, at *17.

Arjo relies on *Hess Newark Owens Wolf, Inc. v. Owens*, 415 F.3d 630 (7th Cir. 2005), to argue that it need not show "actual loss" to satisfy the standard. Its reliance is misplaced. *Hess* concerned whether a plaintiff had to establish specific *past* injury to demonstrate irreparable harm sufficient to warrant a preliminary injunction. *Id.* at 632. The Seventh Circuit held that concrete past injury was not necessary. After all, a preliminary injunction is a prospective form of relief designed to *prevent* irreparable harms. Therefore, because the defendant in *Hess* was "engaged in ongoing competition" against the plaintiff resulting in "ongoing diversion of business" in violation of an ongoing non-compete agreement, irreparable harm was sufficiently established.

20

*Id.* at 632-33.  Here, in contrast, there is no evidence of ongoing irreparable harm.  And, regarding the two contracts Arjo emphasized at the hearing on this motion, all parties agree that the provision of the distributor agreement that allegedly rendered them unlawful was in effect for at most ninety days after the termination of the distributor agreement and thus cannot be the basis for a future injury.

The Court is persuaded that, to the extent that Arjo has demonstrated harm, "the damage is done." *Traffic Tech*, 2015 WL 9259544 at *17.  And this conclusion is only reinforced by the 121-day delay between the denial of the TRO and Arjo's filing of this motion (though the Court emphasizes that it would reach the same result even without this delay).  Although Arjo alleges that it sustained new injuries in the interim, it has not explained the delay.  And because preliminary injunctions are prospective in nature, Arjo must show that continued irreparable harm is likely.  *See Turnell*, 796 F.3d at 661. It has failed to do so.

In sum, although Arjo can show a sufficient likelihood of success on the merits of its breach-of-contract and tortious-interference claims to meet the first requirement for the preliminary injunction, it has not shown that it faces ongoing irreparable harms or that its remedies at law are inadequate.  The motion for preliminary injunction is therefore denied.

## D.    Balance of the equities and public interest

As noted above, "[i]f the movant makes the required threshold showing, then the court proceeds to the second phase, in which it considers: (4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if

any, that the grant or denial of the preliminary injunction would have on nonparties (the 'public interest')." *Turnell*, 796 F.3d at 661-62. Because the Court has concluded that Arjo has *not* made the required threshold showing, it is unnecessary to assess these factors.

## Conclusion

For the foregoing reasons, the Court denies Arjo's motion for a preliminary injunction [dkt. no. 61]. The case is set for a status hearing on November 8, 2018 at 9:30 a.m. to set a schedule for further proceedings.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: October 25, 2018